Quentin M. Rhoades
State Bar No. 3969
Rob Erickson
State Bar No. 9966
RHOADES & ERICKSON PLLC
430 Ryman Street
Missoula, Montana 59802
(406) 721-9700 (phone)
(406) 721-5838 (fax)
qmr@montanalawyer.com
erickson@montanalawyer.com
courtdocs@montanalawyer.com

*Pro Querente*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MONTANA

HELENA DIVISION

| | |
|---|---|
| **JOHN ANTHONY CASTRO,** | **Cause No.:** 6:23-cv-00062-SPV |
| Plaintiff, | |
| v. | |
| | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| **SECRETARY OF STATE CHRISTI JACOBSON, and DONALD JOHN TRUMP** | |
| Defendants. | |

Defendant Donald John Trump ("President Trump"), by counsel, hereby

states as follows in support of his Motion to Dismiss.

## Introduction

Plaintiff is a repeat litigant who has filed identical lawsuits in dozens of other jurisdictions across the country.[1] None have been successful. In a barebones complaint based on mere conclusory assertions that President Trump violated an oath to support the Constitution by engaging in insurrection, Plaintiff asks the Court to enter an unprecedented declaratory judgment that President Trump is constitutionally-barred from holding any elective office or appearing on 2024 primary and general election ballots in Montana. Plaintiff also asks the Court to enjoin Defendant Montana Secretary of State of Christi Jacobson from placing President Trump on the aforementioned ballots. This relief is extraordinary and unprecedented. In fact, all courts to have decided the issue have concluded that Plaintiff's Complaint fails as a matter of law.

President Trump requests that this Court do the same and dismiss Plaintiff's Complaint with prejudice. First, Plaintiff has no standing to bring his claims: he suffers no cognizable injury in fact and his Complaint arises to nothing more than general grievances. Second, even if the Complaint could support the requisite standing, this case presents a nonjusticiable political question that is constitutionally

---

[1] Attached as an exhibit to this submission is an addendum of similar lawsuits filed seeking to exclude President Trump from the ballot.

committed to Congress. Third, the Fourteenth Amendment is not self-executing—neither Plaintiff nor Defendant Jacobsen has the authority to enforce the Fourteenth Amendment as Plaintiff desires. Fourth, and finally, the prohibitions of Section Three of the Fourteenth Amendment do not even apply to President Trump, or the conduct as alleged in the Complaint.

In light of the manifest shortcomings of the Complaint,[2] President Trump moves that it be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1) & (6).

## Standard of Law

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction challenges a court's authority to hear a matter brought by a complaint. That rule provides that a complaint may be dismissed for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). In a motion to dismiss for lack of subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims." *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir. 1983).

---

[2] Furthermore, it is worth noting that Plaintiff's attempt at service was ineffective. *See* Fed. R. Civ. P. 5. Plaintiff merely mailed the Summons and Verified Complaint to Mar-a-Lago Club's general address. [*See* CM/ECF No. 7-1 at 1.]

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) is proper if the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support a cognizable legal theory. *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).

## Discussion

## I. Plaintiff lacks standing because he cannot plausibly establish injury, causation or redressability.

Plaintiff lacks standing to challenge President Trump's placement on the ballot for the 2024 election. *See Castro v. Trump*, Case No. 23-80014-CIV-CANNON (S.D. Fl. June 26, 2023) (dismissing similar claim from this same Plaintiff for lack of Article III standing); *Castro v. FEC*, No. 1:22-cv-02176, 2022 WL 17976630 (D.D.C. Dec. 6, 2022) (same). Earlier this week, the Supreme Court of the United States denied Plaintiff's *writ of certiorari* seeking to reverse the dismissal of identical claims for lack of standing. *Castro v. Trump*, Case No. 23-117, ___ S. Ct. ___, 2023 WL 6379034 (Oct. 2, 2023).

It is a bedrock requirement for any claim "that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). (1992)). To establish constitutional standing, plaintiffs must demonstrate three elements, which constitute the "irreducible ... minimum" of Article III standing. *Lujan v. Defendders of Wildlife,* 504 U.S. 555, 561 (1992). They are: (1) *injury-in-fact*—plaintiff must allege "concrete and particularized" and "actual or imminent" harm to a legally protected interest, *id.* at 560–61; (2) *causal connection*—the injury must be "fairly traceable" to the conduct complained of, *Allen v. Wright,* 468 U.S. 737, 751, (1984); and (3) *redressability*—a favorable decision must be "likely" to redress the injury-in-fact, *Lujan,* 504 U.S. at 560–61. *See also Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011) (stating the elements).

Concrete injuries must be "*de facto*; that is, [they] must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). A concrete injury need not be tangible. *See id.* But in determining whether such an intangible harm constitutes a concrete injury, the Supreme Court has held that "both history" (particularly "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as provided a basis for a lawsuit in English of American courts") and the "judgment of Congress play important roles." *Spokeo*, 578 U.S. at

340-41. To that end, it is axiomatic that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

Article III standing is particularly important where a plaintiff seeks "an interpretation of a constitutional provision which has never before been construed by the federal courts," and where "the relief sought produces a confrontation with one of the coordinate branches of the Government." *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 221-22 (1974). A showing of "concrete injury removes from the realm of speculation whether there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Id.* As the Supreme Court noted in *Schlesinger*, "[t]o permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create a potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing government by injunction." *Id.* at 222.

Accordingly, courts have widely held that individual voters lack standing to challenge the qualifications of presidential candidates.[3] In affirming the dismissal of a claim challenging President Obama's qualifications for office, the Third Circuit held that "a candidate's ineligibility . . . does not result in an injury in fact to voters." *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) ("[E]ven if . . . the placement of an ineligible candidate on the presidential ballot harmed [plaintiff]], that injury . . . was too general for the purposes of Article III [because plaintiff] shared . . . his interest in the proper application of the Constitution . . . with all voters."). When another set of challengers sought to differentiate themselves from the voting public by relying on their status as former service members of the Armed Forces and the National Guard, the Third Circuit re-affirmed dismissal for lack of standing. *Kerchner v. Obama*, 612 F.3d 204, 208 (3d Cir. 2010) ("Carving out an exception on that basis would still

---

[3] *See, e.g.*, *Hollander v. McCain*, 566 F.Supp.2d 63, 71 (D.N.H. 2008), *Cohen v. Obama*, 2008 WL 5191864, *1 (D.D.C., Dec. 11, 2008); *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009); *Barnett v. Obama*, No. SACV09-0082 DOC(ANX), 2009 WL 3861788 (C.D. Cal. Oct. 29, 2009) at *8, *order clarified*, No. SA CV 09-0082 DOC, 2009 WL 8557250 (C.D. Cal. Dec. 16, 2009), and *aff'd sub nom. Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011); *Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010); *Drake v. Obama*, 664 F.3d 774, 781-782 (9th Cir. 2011); *Sibley v. Obama*, 866 F.Supp.2d 17, 20 (D.D.C. 2012); *Grinols v. Electoral Coll.*, No. 2:12-CV-02997-MCE, 2013 WL 2294885, at *10 (E.D. Cal. May 23, 2013), *aff'd*, 622 F. App'x 624 (9th Cir. 2015); and *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *20 (S.D. Miss. Mar. 31, 2015); *Const. Ass'n Inc. by Rombach v. Harris*, No. 20-CV-2379, 2021 WL 4442870, at *2 (S.D. Cal. Sept. 28, 2021), *aff'd*, No. 21-56287, 2023 WL 418639 (9th Cir. Jan. 26, 2023); *Booth v. Cruz*, No. 15-CV-518, 2016 WL 403153, at *2 (D.N.H. Jan. 20, 2016), *report and recommendation adopted*, 2016 WL 409698 (D.N.H. Feb. 2, 2016); *Fischer v. Cruz*, No. 16-CV-1224, 2016 WL 1383493, at *2 (E.D.N.Y. Apr. 7, 2016).

leave an impermissibly large class with unique ability to sue in federal court."). The Court rejected plaintiffs' argument that they "may be required to serve . . . as a combatant in case of an extreme national emergency" as too "conjectural." *Id.*

Plaintiff seems to believe that he has manufactured standing for himself by registering with the FEC as a presidential candidate, thereby inventing a "competitive injury" whereby President Trump's candidacy diverts votes and donations that would otherwise go to Plaintiff. Like the hypothetical scenario in *Kerchner,* this also is far too conjectural to confer Article III standing. For standing purposes, courts may consider context when assessing a litigant's purported candidacy. In *Golden v. Zwickler*, an individual claimed to be a bona fide political candidate for U.S. Congress—but after assessing the context of the plaintiff's lawsuit, the Supreme Court determined that the individual's candidacy "was neither real nor immediate" enough to confer standing to sue. 394 U.S. 103, 109-110 (1969).

The same is true here. A one-page form with the FEC does not confer Article III standing. There are currently approximately 292 individuals registered with the FEC as Republican Party candidates for the presidency. Only a few of these registered "candidates" will launch an actual presidential campaign. Plaintiff does not allege that he appears on any national polling. Plaintiff does not allege that he has requested placement on the upcoming primary ballot in Montana. Plaintiff does not

allege that he has secured a single dollar in campaign contributions. (FEC records indicate he has not.[4]) Plaintiff does not allege any concrete support from anyone, let alone voters and/or political actors in this State and/or the Montana Republican Party. Plaintiff does not allege any facts sufficient to plausibly establish that his "candidacy," let alone any competition with President Trump for votes and donors in the Montana primary, is "real" or "immediate."

Thus, Plaintiff's allegations fail to meet each of the injury, causation, and redressability requirements for Article III standing. First, he fails to allege an injury that is sufficiently concrete, individual and particularized to confer standing. Plaintiff has not identified a single voter or donor who identifies Castro as his or her "second choice" after President Trump.[5] He has alleged no expert or social science evidence that could support the inherently improbable claim that there is a latent Castro movement that would surface among Montana voters if only Trump was not on the ballot. "Conjectural" or "hypothetical" harms do not suffice. *Lujan*, 504 U.S. at

---

[4]      *Candidates*, Federal Election Commission, https://www.fec.gov/data/candidates/?election_year=2024 &office=P (last visited Oct. 3, 2023).

[5]      Plaintiff's vague claim that he has "spoken to thousands of voters who have expressed that they would vote for Castro only if Trump is not a presidential candidate," beyond the fact it is patent hearsay, does not help Plaintiff. This anecdotal hearsay evinces voter "political loyalty" to President Trump rather than an injury-in-fact to Plaintiff.

560. Ultimately, he alleges only the same, general grievance as anyone else—and that is insufficient to meet his burden.

Second, Plaintiff fails to allege facts sufficient to establish that President Trump's placement on the primary ballot, as opposed to other factors, is fairly traceable to his asserted injury. On this point, Plaintiff merely alleges that "[i]t is indisputable that Castro's injury-in-fact is traceable to Trump." [CM/ECF No. 1 at 50.] To the contrary, there is no plausible claim that President Trump's inclusion on the ballot materially reduces Plaintiff's chances of being awarded Montana delegates to the Republican National Convention. Even if President Trump was not on the ballot, there is no plausible claim that any meaningful number of votes would go to Plaintiff as opposed to nationally (or locally) recognized candidates. Absent any such plausible factual allegation, he has not met his obligation to show a causal relationship between President Trump being on the ballot and Plaintiff's inevitable failure to win the Montana primary.

Third, any injury to the Plaintiff caused by the inclusion of President Trump on the ballot is not redressable by this Court. The removal of President Trump from the Montana ballot would not result in Plaintiff securing a single campaign contribution or vote in the State—let alone winning State delegates in the Republican National Convention. Certainly, Plaintiff has not alleged—much less

proven—any plausible mechanism by which these supposed injuries would be redressed by the federal courts.

Plaintiff's claim that he has "competitive injury" standing is misplaced. Generally, cases finding competitive standing in the election law context have been brought by political parties seeking to exclude competing parties and candidates from the general election ballot. *See, e.g., Texas Dem. Party v. Benkiser*, 459 F.3d 582, 586-87 n.4 (5th Cir. 2006); *Schulz v. Williams,* 44 F.3d 48, 53 (2nd Cir. 1994); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990). But Plaintiff's claimed injury-in-fact is different in kind from that of an established political party. Plaintiff has identified no instance in which competitive injury standing has been extended to a political party's primary election, where the question is not who will win a public office, but rather who will be that party's nominee. Nor has he cited a case in which competitive standing was established in a contest to elect delegates to a national political convention. And certainly, neither Congress nor common law or history support such a proposition.

Nor, in this instance, does common sense. Even if Plaintiff's status as a putative "competitor" serves to distinguish him in some measure from those whose generalized claim to standing derives merely from their status as voters, it does not remedy the standing defects posed by the sheer implausibility—

unleavened by any measure of reality—of Plaintiff's claims of injury, causation, and redressability. If a plaintiff were to claim that, if only the court would order that his opponent cease doing X, plaintiff would be able to float off into the air, the court is not simply required to accept that fantastic assertion as a basis for standing absent some measure of *proof* that the plaintiff actually would float into the air, or at least that there is a plausible basis for believing that he would.

II.     **Plaintiff's claims raise a nonjusticiable political question because a presidential candidate's qualifications are reserved for Congress and the voters to decide.**

Even if this claim were brought by a plaintiff with standing, it would still be nonjusticiable. Our Constitution commits to Congress and the Electoral College exclusive power to determine presidential qualifications and whether a candidate can serve as President. Federal and state courts presented with similar cases challenging the qualifications of presidential candidates have uniformly held that they present nonjusticiable political questions reserved for those entities. This Court should do likewise.

Political questions are nonjusticiable and therefore not cases or controversies. *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). The United States Supreme Court set out broad categories that should be considered nonjusticiable political questions in *Baker v. Carr*, 369 U.S. 186, 217 (1962):

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; [and 6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Numerous courts have held that similar challenges to the qualifications of presidential candidates (like Barack Obama and John McCain) present nonjusticiable political questions. The Third Circuit held that a challenge to the qualifications of then-candidate Obama (based on his nationality) was a political question not within the province of the judiciary. *See Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009). Multiple district courts reached the same conclusion. In *Grinols v. Electoral College*, No. 2:12–cv–02997–MCE–DAD, 2013 WL 2294885, at *5-7 (E.D. Cal. May 23, 2013), the Court dismissed a challenge to President Obama's qualifications for office.[6] There, the Court held that "the Constitution assigns to Congress, and not to federal courts, the responsibility of determining whether a person is qualified to

---

[6]     Although the *Grinols* plaintiff sought the removal of a sitting president rather than a presidential candidate, the court had previously refused to grant a temporary restraining order to prevent President Obama's re-election on political question grounds. *Grinols v. Electoral Coll.*, No. 12-CV-02997-MCE-DAD, 2013 WL 211135, at *4 (E.D. Cal. Jan. 16, 2013)

serve as President of the United States. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer." *Id.* at *6. Likewise, in *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373 (S.D. Miss. Mar. 31, 2015), the Court noted that the presidential electoral and qualification process "are entrusted to the care of the United States Congress, not this court" and that the plaintiffs' disqualification claims were therefore nonjusticiable. *Id.*

In *Robinson v. Bowen*, 567 F. Supp. 2d 1144 (N.D. Cal. 2008), the Court dismissed a case brought before the 2008 election seeking to remove Senator McCain from the ballot:

> It is clear that mechanisms exist under the Twelfth Amendment and 3 U.S.C. § 15 for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. Arguments concerning qualifications or lack thereof can be laid before the voting public before the election and, once the election is over, can be raised as objections as the electoral votes are counted in Congress. The members of the Senate and the House of Representatives are well qualified to adjudicate any objections to ballots for allegedly unqualified candidates. Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review—if any—should occur only after the electoral and Congressional processes have run their course.

14

*Id.* at 1147.

The Montana legislature gives the Secretary of State only limited powers to determine the qualifications of candidates. There are just two criteria for a candidate to qualify for placement on the ballot:

> (a) The individual has submitted a declaration for nomination that is signed by the candidate or an authorized campaign official to the secretary of state pursuant to 13-10-201(2) and has been nominated on petitions with the verified signatures of at least 500 qualified electors. The secretary of state shall prescribe the form and content of the petition.
>
> (b) The individual has submitted a declaration for nomination to the secretary of state pursuant to 13-10-201, and the secretary of state has determined, by the time that declarations for nomination are to be filed, that the individual is eligible to receive payments pursuant to the federal Presidential Primary Matching Payment Account Act, 26 U.S.C. 9031, et seq.

Mont. Code Ann. § 13-10-404(1).

Thus, the Secretary of State has no authority to pre-judge a candidate's qualifications for office and strike a candidate from the ballot. If the Secretary of State were to attempt to do so, that exercise would violate separation of powers:

> If a state court were to involve itself in the eligibility of a candidate to hold the office of President, a determination reserved for the Electoral College and Congress, it may involve itself in national political matters for which it is institutionally ill-suited and interfere with the constitutional authority of the Electoral College and Congress.

*Strunk v. New York State Bd. Of Elections*, No. 6500/11, 2012 WL 1205117, *12 (Sup.

Ct. Kings County NY Apr. 11, 2012). The California Court of Appeals' language in

*Keyes v. Bowen*, 189 Cal.App.4th 647, 660 (2010), is also instructive:

> In any event, the truly absurd result would be to require each state's election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party's selection of a presidential candidate. The presidential nominating process is not subject to each of the 50 states' election officials independently deciding whether a presidential nominee is qualified, as this could lead to chaotic results. Were the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines. Any investigation of eligibility is best left to each party, which presumably will conduct the appropriate background check or risk that its nominee's election will be derailed by an objection in Congress, which is authorized to entertain and resolve the validity of objections following the submission of the electoral votes.

*See id.*; *accord, e.g., Jordan v. Secretary of State Sam Reed,* No. 12-2-01763-5, 2012 WL

4739216, at *1 (Wash. Super. Aug. 29, 2012) ( "I conclude that this court lacks

subject matter jurisdiction. The primacy of congress to resolve issues of a candidate's

qualifications to serve as president is established in the U.S. Constitution.")

It is well-settled that the Constitution vests responsibility in Congress—and

*only* in Congress—to determine a presidential candidate's qualifications for office.

This case therefore presents a nonjusticiable political question.

**III. Plaintiff's Complaint further fails because the Fourteenth Amendment is not self-executing and nothing has occurred to disqualify President Trump.**

Even if this case did not pose a political question and was brought by a plaintiff with standing, it would still not succeed on the merits. Section Three of the Fourteenth Amendment is not self-executing, and, therefore, it cannot support a cause of action absent an authorizing statute. A recent article by scholars Joshua Blackman and Seth Barrett Tillman summarizes the question of whether Section Three is self-executing as follows:

> In our American constitutional tradition there are two distinct senses of self-execution. First, as a shield—or a defense. And second, as a sword—or a theory of liability or cause of action supporting affirmative relief. The former is customarily asserted as a defense in an action brought by others; the latter is asserted offensively by an applicant seeking affirmative relief.
>
> For example, when the government sues or prosecutes a person, the defendant can argue that the Constitution prohibits the government's action. In other words, the Constitution is raised defensively. In this first sense, the Constitution does not require any further legislation or action by Congress. In these circumstances, the Constitution is, as Baude and Paulsen write, self-executing.
>
> In the second sense, the Constitution is used offensively–as a cause of action supporting affirmative relief. For example, a person goes to court, and sues the government or its officers for damages in relation to a breach of contract or in response to a constitutional tort committed by government actors. As a general matter, to sue the federal government or its officers, a private individual litigant must invoke a federal statutory cause of action. It is not enough to merely allege some

unconstitutional state action in the abstract.  Section 1983, including its statutory antecedents, *i.e.*, Second Enforcement Act a/k/a Ku Klux Klan Act of 1871, is the primary modern statute that private individuals use to vindicate constitutional rights when suing state government officers.

Constitutional provisions are not automatically self-executing when used offensively by an applicant seeking affirmative relief.  Nor is there any presumption that constitutional provisions are self-executing.[7]

Ample precedent supports Blackman and Tillman's conclusions. One year after ratification, the Chief Justice Salmon P. Chase of the Supreme Court of the United States ruled that Section Three was not self-executing and that it could only be enforced through specific procedures prescribed by Congress or the United States Constitution. *In re Griffin*, 11 F.Cas. 7 (C.C.Va 1869). Chief Justice Chase reasoned that a different conclusion would have created an immediate and intractable national crisis. In response to this ruling, Congress almost immediately enacted legislation suggested by the Chief Justice.

In 1870, Congress passed a law, entitled the "Enforcement Act," which allowed federal district attorneys (but not state election officials) authority to enforce Section Three. The Enforcement Act allowed U.S. district attorneys to seek writs of

---

[7]     Blackman and Tillman, *Sweeping and Forcing the President Into Section 3: A Response to William Baude and Michael Stokes Paulsen*, at 12, last seen September 28, 2023, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4568771 (emphasis in original; internal footnote omitted).

*quo warranto* from federal courts to remove from office people who were disqualified by Section Three, and further provided for separate criminal trials of people who took office in violation of Section Three. Federal prosecutors immediately started exercising *quo warranto* authority, bringing charges against Jefferson Davis and others.

These actions waned after a few years,[8] and the Amnesty Act of 1898 completely removed all Section Three disabilities incurred to that date. In 1925, the Enforcement Act was repealed entirely. (By then, nearly every participant in the Civil War had passed away.) A century later, in 2021, legislation was introduced in Congress to create a cause of action to remove individuals from office who were engaged in insurrection or rebellion, but that bill died in Congress.[9] Thus, there is no private right of action that allows voters such as the Plaintiff to enforce Section 3 of the Fourteenth Amendment against Trump.

Chief Justice Chase's order and the subsequent legislative history demonstrate that Section Three is not self-executing unless Congress takes action to make it so. Section Three does not give individual secretaries of state, the federal courts, or individual plaintiffs the authority to remove a presidential candidate from

---

[8]    *See* Amnesty Act of 1872 (removing most disqualifications in the manner provided by Section Three; Pres. Grant Proclamation 208 (suspending *quo warranto* prosecutions).

[9]    *See* H.R. 1405, 117th Cong. 2021.

the ballot. A successful challenge would create a patchwork of 51 state (and district) election laws and potentially conflicting orders and rulings that would contradict established precedent, constitutional tradition, and common sense. This is the exact crisis Chief Justice Chase feared.

## IV. Section Three's prohibitions do not apply to the President of the United States.

The plain text of Section Three identifies to whom it applies. Section Three states as follows:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, **having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States**, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3 (emphasis added)

The phrase "Officers of the United States" does not include the President. *See* Josh Blackman & Seth Barrett Tillman, *Is the President an "Officer of the United States" for Purposes of Section 3 of the Fourteenth Amendment?,* 15(1) N.Y.U. J.L. & LIBERTY 1 (2021). Shortly after ratification of Section Three:

> In 1876, the House of Representatives impeached Secretary of War
> William Belknap. During the trial, Senator Newton Booth from
> California observed, "the President is not an officer of the United
> States." Instead, Booth stated, the President is "part of the
> Government." Two years later, David McKnight wrote an influential
> treatise on the American electoral system. He reached a similar
> conclusion. McKnight wrote that "[i]t is obvious that . . . the President
> is not regarded as 'an officer of, or under, the United States,' but as one
> branch of 'the Government.'[10]

Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President Into Section 3*, 28(2) TEX. REV. L. & POL. 112 (forthcoming circa Mar. 2024) (quoting David A. McKnight, The Electoral System of the United States: A Critical and Historical Exposition of its Fundamental Principles in the Constitution, and the of the Acts and Proceedings of Congress Enforcing it, 346 (Philadelphia, J.B. Lippincott & Co. 1878)).

Recent precedent supports this history. Interpreting the Appointments Clause, the Supreme Court observed that "[t]he people do not vote for the 'Officers of the United States.'" *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 497-98 (2010) (quoting U.S. Const. Art. II, § 2, cl.2). As noted

---

[10] Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President Into Section 3*, 28(2) TEX. REV. L. & POL. 112 (forthcoming circa Mar. 2024) (quoting David A. McKnight, The Electoral System of the United States: A Critical and Historical Exposition of its Fundamental Principles in the Constitution, and the of the Acts and Proceedings of Congress Enforcing it, 346 (Philadelphia, J.B. Lippincott & Co. 1878)).

by the Supreme Court in 2020, "Article II distinguishes between two kinds of officers—principal officers (who must be appointed by the President with the advice and consent of the Senate) and inferior officers (whose appointment Congress may vest in the President, courts, or heads of Departments)." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, n. 3 (2020). Neither category includes the President.

Three provisions in the U.S. Constitution show that the President is not "an officer of the United States":

> First, presidents fall under the scope of the Impeachment Clause precisely because there is express language in the clause providing for presidential impeachments; the Impeachment Clause does not rely on general "office"- or "officer"-language to make presidents impeachable. We think this is the common convention with regard to drafting constitutional provisions. When a proscription is meant to control elected positions, those positions are expressly named, as opposed to relying on general "office"- and "officer"-language. Congress does not hide the Commander in Chief in mouseholes or even foxholes. For example, in 1969, future-Chief Justice William H. Rehnquist, then an Executive Branch attorney, addressed this sort of clear-statement principle. Statutes that refer to "officers of the United States," he wrote, generally "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Five years later, future-Justice Antonin Scalia, then also an Executive Branch attorney, reached a similar conclusion with regard to the Constitution's "office"-language. These Executive Branch precedents would counsel against deeming the President an "officer of the United States."

> Second, as to the Appointments Clause, which uses "Officers of the United States"-language, Presidents do not appoint themselves or their successors. The Supreme Court hears a never-ending stream of cases

that ask if a particular position is a principal or inferior officer of the United States—even though the Appointments Clause does not even distinguish between those two types of positions. Where has the Court ever suggested that the President falls in the ambit of the Appointments Clause's "Officers of the United States"-language? . . .

And, finally, as to the Commissions Clause, which also uses "Officers of the United States"-language, Presidents do not commission themselves, their vice presidents, their successor presidents, or successor vice presidents.

*Sweeping and Forcing the President Into Section 3*, *supra* at 106-07.

And finally, the structure of Section Three itself shows that it does not apply to the office of the President.

The second clause does not expressly list several categories of positions: *e.g.*, presidential electors, appointed officers of state legislatures, members of state constitutional conventions, and state militia officers. The first clause does not expressly list several categories of positions: *e.g.*, members of the state legislatures, and members of state constitutional conventions. Neither list expressly mentions the President and Vice President.

*Id.* at 115.

Moreover, Section Three of the Fourteenth Amendment applies only to those who have "previously taken an oath…to *support* the Constitution of the United States." U.S. Const. amend. XIV, § 3. (Emphasis supplied). Certain members of the federal and state governments take such an oath:

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers,

both of the United States and of the several States, shall be bound by Oath or Affirmation, *to support this Constitution . . . .*

U.S. Const. art. VI, cl. 3 (emphasis added). But the President of the United States does not. The presidential oath instead reads:

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:– I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and *will to the best of my Ability, preserve, protect and defend the Constitution of the United States.*

U.S. Const., art. II, § 1, cl. 8 (emphasis supplied).

The difference between the oath to *support* the constitution (per Article VI) and the oath to *preserve, protect and defend* the constitution (per Article II) is a significant one. It establishes that the drafters of the Fourteenth Amendment did not understand the President to be an Officer of the United States. And taking an oath to support the Constitution further limits the class the people to whom Section Three applies. President Trump is not one of those people.

Section Three's drafting is no accident, but rather rooted in Framer's robust debate and careful wordsmithing. The words that both the Framers and the drafters of the Fourteenth Amendment chose must be given their proper meaning. *Martin v. Hunter's Lessee*, 14 U.S. 304, 334 (1816) ("From this difference of phraseology, perhaps, a difference of constitutional intention may, with propriety, be inferred. It

is hardly to be presumed that the variation in the language could have been accidental."). When drafting the Impeachment Clause, the Framers initially referred to the President, Vice President, and "other civil officers of the U.S." *See* 2 The Records of the Federal Convention of 1787, at 545 and 552 (Farrand ed., 1911). But upon further deliberation, the Framers changed the Impeachment Clause to remove the word "other." *Id.* at 600. This change shows that the Framers understood that the President was not one of the "other" officers of the United States—instead, the President is *outside* the category of "officers of the United States," and, therefore, falls outside the ambit of Section Three.

## V.    Section Three does not even apply to the conduct alleged in the Complaint.

The Complaint rests on misreading Section Three to say what it does not. Plaintiff alleges that President Trump "provided 'aid or comfort' to an in insurrection in violation of Section 3 of the 14th Amendment . . . and is therefore constitutionally ineligible to hold any public office in the United States." [CM/ECF No. 1 at ¶ 14.] But Section Three does not speak in terms of providing aid or comfort to an insurrection; Section Three applies when an official has "*engaged* in insurrection or rebellion" or "given aid or comfort *to the enemies [of the*

*United States.]*" U.S. Const. amend. XIV, § 3 (emphasis added). Plaintiff fails to plausibly allege that President Trump did either of those things.

A.    The January 6th riot does not constitute an "insurrection" under Section Three.

Section Three speaks in terms of "insurrection" and "rebellion"—and these terms were not pulled out of thin air. Congress modeled Section Three partly on the original Constitution's Treason Clause, and partly on the Second Confiscation Act (enacted in 1862). The Confiscation Act punished anyone who "shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States … or give aid or comfort thereto." 12 Stat. 589, 627 (1862); *see* 18 U.S.C. § 2383. Section Three similarly covers "insurrection or rebellion." U.S. Const., amend. XIV, § 3. But unlike the Confiscation Act, Congress excluded from Section Three any penalty for inciting, assisting, or giving aid to insurrection.  Section Three only penalizes those who "engaged" in it. *Id.*

Congress discussed the meaning of "insurrection" and "rebellion" at length in debates. Congress confirmed that insurrection and rebellion describe two types of treason—not lesser crimes. *See* 37 Cong. Globe 2d Session, 2173, 2189, 2190-91, 2164-2167 (1862). After ratification, Congress reinforced these same conclusions when debating enforcement of Section Three. 41 Cong. Globe 2d Session, 5445-46

26

(1870). The Congress that had just drafted Section Three believed that someone committed "insurrection" or "rebellion" if he led uniformed troops in battle against the United States, but not if he or she merely voted to support secession with violent force, recruited for the Confederacy, provided wartime aid, or held offices in the rebel government. The drafters chose words that encompassed at least the main actors in that act of treason, but no more. They were not trying to legislate with an eye toward political riots. In the aftermath of the Civil War, these were imminently important distinctions.

One year after the Confiscation Act became law, Chief Justice Chase held that the Act prohibits only conduct that "amount[s] to treason within the meaning of the Constitution," not any lesser offense. *United States v. Greathouse*, 26 F. Cas. 18, 21 (C.C.N.D. Cal. 1863). Not just any form of treason would do: the Act only covered treason that "consist[ed] in engaging in or assisting a rebellion or insurrection." *Id.* Writing in the same case, a second judge confirmed and clarified that, for these purposes, "engaging in a rebellion and giving it aid and comfort[] amounts to a levying of war," and that insurrection and treason involve "different penalt[ies]" but are "substantially the same." *Id.* at 25.

Dictionaries of the time confirm this understanding. John Bouvier's 1868 legal dictionary defined "insurrection" as a "rebellion of citizens or subjects of a country

27

against its government," and "rebellion" as "taking up arms traitorously against the government." *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* (Philadelphia, G.W. Childs, 12th ed., rev. and enl. 1868).

So "insurrection," as understood at the time of the passage of the Fourteenth Amendment, meant the taking up of arms and waging war upon the United States. At the time of Section Three's enactment, the United States had undergone a horrific civil war in which over 600,000 combatants died, and the very survival of the nation was in doubt. As shown by the omission of the word "incitement" in Section Three, Congress did not intend that provision to encompass those who merely encouraged an insurrection, but instead limited its breadth to those who actively participated in one.

Plaintiff's entire case is based upon President Trump's alleged nexus to an "insurrection," but Plaintiff is short on any facts to show that the January 6th riots constituted one. *See Greathouse*, 26 F. Cas. at 21 and 25. Not one of the 1,000+ people charged in connection with the riot has so far even been charged—much less convicted—under 18 U.S.C. § 2383. *See United States v. Griffith*, 2023 WL 2043223, *6 n. 5 (D. DC, Feb. 16, 2023) (finding that "no defendant has been charged with [18 U.S.C. § 2383]); Alan Feuer, *More Than 1,000 People Have Been Charged in*

*Connection with the Jan. 6 Attack*, New York Times (Aug. 1, 2023). The Senate found President Trump not guilty of impeachment charges of insurrection brought by the 117th Congress. *See* Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors, H. 24, 117th Cong. (2021).[11] No court in the United States has found President Trump guilty under 18 U.S.C. § 2383. Not a single prosecutor has filed an indictment against President Trump for an alleged rebellion or insurrection.

B.     <u>Mere words do not constitute "engaging" in insurrection.</u>

Even so, Plaintiff fails to establish that President Trump "engaged" in insurrection. Plaintiff's core allegations of President Trump's "expressions of sympathy" fall well short. [CM/ECF No. 9 at 4-5.] As explained above, the framers of the Fourteenth Amendment made a deliberate choice that Section Three should cover only actual "engage[ment] in" insurrection or rebellion (or assisting a foreign power), not advocating rebellion or insurrection. Mere words, unaccompanied by actions or legal effect, cannot meet that standard. That is especially the case here because President Trump's words and speeches cannot qualify as incitement under

---

[11]     The Senate's not guilty vote can be found at https://www.senate.gov/legislative/LIS/roll_call_votes/vote1171/vote_117_1_00059.htm (last visited on October 6, 2023).

established First Amendment principles. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969).

The same representatives who voted for the Fourteenth Amendment understood that, under its terms, even strident and explicit antebellum advocacy for a future rebellion was not "engaging in insurrection" or providing "aid or comfort to the enem[y]." In 1870—just two years after the Fourteenth Amendment was ratified—Congress considered whether Section Three disqualified a Representative-elect from Kentucky when, before the Civil War began, he had voted in the Kentucky legislature in favor of a resolution to "resist [any] invasion of the soil of the South at all hazards." 41 Cong. Globe, 2d Session, 5443 (1870). The House found that this was not disqualifying. *Id.* at 5447. Similarly, in 1870 the House also considered the qualifications of a Representative-elect from Virginia who, before the Civil War, had voted in the Virginia House of Delegates for a resolution that Virginia should "unite" with "the slaveholding states" if "efforts to reconcile" with the North should fail, and stated in debate that Virginia should "if necessary, fight," but who after Virginia's actual secession "had been an outspoken Union man." *Hinds' Precedents of the House of Representatives of the United States*, 477 (1907). The House found that this did not disqualify him under Section Three. *Id.* at 477-78. By contrast, the House *did* disqualify a candidate who "had acted as colonel in the rebel army" and "as

governor of the rebel State of North Carolina." *Id.* at 481, 486. Plaintiff's allegations fall well-short of how Congress has understood and applied Section Three in practice.

C.      Not only does "inciting" fall well short of "engaging," but Plaintiff's allegations also fall short of "inciting."

 "[T]he free discussion of governmental affairs of course includes discussions of candidates, structures and forms of government, the manner in which government is operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). "Indeed, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco City Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). There is no exception to this rule for allegedly disloyal speech. The Supreme Court considered the Georgia legislature's refusal to seat an elected candidate, on the ground that his strident criticisms of the Vietnam War "gave aid and comfort to the enemies of the United States" and were inconsistent with an oath to support the Constitution. *Bond v. Floyd,* 385 U.S. 116, 118-23 (1966). The Court held that the candidate's speech was protected by the First Amendment and could not be grounds for disqualification. *Id.* at 133-37.

Thus, "dissenting political speech" remains "within the First Amendment's core," even where it is alleged to be "mere advocacy of illegal acts" or "advocacy of force or lawbreaking." *Counterman v. Colorado*, 143 S. Ct. 2106, 2115, 2118 (2023). The Constitution values and protects such speech unless it qualifies as "advocacy of the use of force or law violation" that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S., at 447.

Under the *Brandenburg* test, Trump's comments did not come close to "incitement," let alone "engagement" in an insurrection. As the Sixth Circuit recognized in analyzing President Trump's public speech, "the fact that audience members reacted by using force does not transform Trump's protected speech into unprotected speech. Thus, where "Trump's speech … did not include a single word encouraging violence … the fact that audience members reacted by using force does not transform" it into incitement. *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018). And as a D.C. Circuit judge remarked at argument last year, "you just print out the speech . . . and read the words … it doesn't look like it would satisfy the [*Brandenburg*] standard." Tr. of Argument at 64:5-7 (Katsas, J.), *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. Dec. 7, 2022). And the Supreme Court, for instance, has concluded that a call to "take the f[***]ing streets later" does not meet the

standard. *Hess v. Indiana*, 414 U.S. 105, 107 (1973); *accord Nwanguma*, 903 F.3d at 611-12 (responding to a political protestor by repeatedly telling a crowd to "get 'em out of here" but "don't hurt 'em" was not incitement).

Plaintiff has not alleged any statement attributed to President Trump that implicitly or explicitly advocated for illegal conduct. The majority of statements alleged in the Complaint do not reflect any calls to action at all. [*See, e.g.,* CM/ECF No. 1 at ¶¶ 10, 11, 13.] His only explicit instructions called for protesting "peacefully and patriotically,"[12] to "support our Capitol Police and law enforcement,"[13] to "[s]tay peaceful,"[14] and to "remain peaceful."[15] President Trump's calls for peace and patriotism notwithstanding, the courts have made clear that angry rhetoric falls far short of an implicit call for lawbreaking.

Second, none of President Trump's speeches that took place before January 6 can possibly meet *Brandenberg's* imminence requirement. It is utterly impossible to regard statements like "stand back and standby" as advocacy of immediate illegal conduct. [CM/ECF No. 1 at ¶ 9.] But "a state cannot constitutionally sanction

---

[12]    *See, Id.,* at 74:21-25 (Rogers, J.) ("[T]he President didn't say break in, didn't say assault members of Congress, assault Capitol Police, or anything like that.").

[13]    https://twitter.com/realDonaldTrump/status/1346904110969315332.

[14]    *Id.*

[15]    https://twitter.com/realDonaldTrump/status/1346912780700577792

advocacy of illegal action at some indefinite future time." *McCoy v. Stewart*, 282 F.3d 626, 631 (9th Cir. 2002) (cleaned up).

Finally, and again as explained above, none of Plaintiff's allegations plausibly suggest that President Trump intended any acts of violence. Both his language and his actions show the contrary. He intended to inspire a protest to contest an election outcome. That is not insurrectionary or unlawful in any way.

On September 29, 2020, an hour into President Trump's debate with then-candidate Biden, the following exchange occurred:

> [Moderator Chris] WALLACE [to President Trump]: You have repeatedly criticized the Vice-President for not specifically calling out Antifa and other left-wing extremist groups. But are you willing, to-night, to condemn white supremacists and militia groups and to say that they need to stand down and not add to the violence in a number of these cities as we saw in Kenosha, and as we've seen in Port-land.
> TRUMP: Sure, I'm willing to do that.
> WALLACE: Are you prepared specifically to do it. Well go ahead, sir.
> TRUMP: I would say almost everything I see is from the left-wing not from the right wing.
> WALLACE: So what are you, what are you saying?
> TRUMP: I'm willing to do anything. I want to see peace.
> WALLACE: Well, do it, sir.
> [Vice President] BIDEN: Say it. Do it. Say it.
> TRUMP: You want to call them? What do you want to call them? Give me a name, give me a name, go ahead who would you like me to condemn.
> WALLACE: White supremacists and racists.
> BIDEN: Proud Boys.
> WALLACE: White supremacists and white militias.
> BIDEN: Proud Boys.

TRUMP: Proud Boys, stand back and stand by. But I'll tell you what, I'll tell you what: somebody's got to do something about Antifa and the left because this is not a right wing problem this is a left-wing. This is a left-wing problem. [16]

As this context reveals, the "stand back and stand by" remark unambiguously referred to then-recent unrest in cities like Kenosha, Wisconsin and Portland, Oregon. Immediately before that remark, President Trump expressly agreed that his supporters "should not add to the violence in…these cities," and emphasized that he would "do anything" in order "to see peace." And immediately after the remark, President Trump reiterated that the violence was a "problem." His "stand back" statement emphasized that his supporters were not the ones who should "do something" about the problem. This cannot plausibly be interpreted as an endorsement of those groups, let alone of their future actions in response to an election that had not yet happened.

Were that not enough, other facts omitted by Plaintiff conclusively demonstrates that President Trump's "stand back and stand by" remark was condemning and not supporting illegal activity. The very next day, September 30, President Trump emphasized to a reporter that although he was not familiar with the

---

[16]    *September 29, 2020 Debate Transcript*, The Commission on Presidential Debates, *available at* https://www.debates.org/voter-education/debate-transcripts/sep-tember-29-2020-debate-transcript/.

Proud Boys, "***they have to stand down and let law enforcement do their work***….

[W]hoever they are, they have to stand down. Let law enforcement do their work."[17]

When asked again, he reiterated, "Look, law enforcement will do their work.

They're gonna stand down. ***They have to stand down. Everybody***…. Whatever group

you're talking about." *Id.*

Plaintiff's attempt to cast an off-the-cuff remark made in the second-half of a

two-hour debate as "an executive military order to a paramilitary organization," is

beyond absurd. [CM/ECF No. 1 at ¶ 9.] As the full context clearly shows, the alleged

recipient of the "military order" was selected not by the then-Commander-in-Chief,

but rather by candidate-Biden and moderator Chris Wallace. And the content of the

purported "order" itself was chosen not by the President, but—again—by Biden

and Wallace.

The statement could not possibly have been construed to be "an executive

military order" because it was not issued to personnel of the United States Armed

Forces. Military personnel who disobey orders are subject to court martial. "In an

unbroken line of decisions from 1866 to 1960, [the Supreme Court] interpreted the

---

[17] *See* Video recording of President Trump's September 30, 2020, remarks available at https://yo
utu.be/Q8oyhvcOHk0?si=Hp6D0iJytKyUMdnM; *see also* September 30, 2020, Remarks by
President Trump Before Marine One Departure (emphasis
added) *available at* https://trumpwhitehouse.archives.gov/briefings-statements/remarks-
president-trump-marine-one-departure-093020/.

Constitution as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused." *Solorio v. U.S.*, 483 U.S. 435, 439 (1987) (citations omitted). Thus, in order for President Trump's debate-stage statement to be an "executive military order," the recipient of the "military order"–the "Proud Boys"– would have to have status as service-members of the United States armed forces. Plaintiff makes no such allegation, nor could he.

D.   "Aid or comfort to the Enem[y]" under Section Three requires assistance to a foreign power.

Section Three does not incorporate the Confiscation Act's criminalization of giving "aid or comfort" to a "rebellion or insurrection." *See supra* at 11-12. Instead, Section Three harkens back to the Treason Clause, which defines treason as "adhering to [the United States'] Enemies, giving them Aid and Comfort." U.S. Const., Art. III, § 3, cl.1.

The "enemies" prong of the Treason Clause almost exactly replicated a British statute defining treason. *See* 4 Blackstone, Commentaries on the Laws of England 82 (1769). But "enemies" referred only to "the subjects of foreign powers with whom we are at open war," not to "fellow subjects." *Id.* at 82-83. Blackstone was emphatic that "an enemy" was "always the subject of some foreign prince, and one who owes no allegiance to the crown of England." *Id.*

This was also the American view. Four years after the Constitution was ratified, Justice Wilson explained that "enemies" are "the citizens or subjects of foreign princes or states, with whom the United States are at open war." 2 *Collected Works of James Wilson* 1355 (1791). The 1910 version of *Black's Law Dictionary* agrees, defining "enemy" as "either the nation which is at war with another, or a citizen or subject of such nation." *Enemy*, Black's Law Dictionary (2d. Ed. 1910). At the outset of the Civil War, the Supreme Court recognized that the Confederate states should be "treated as enemies," under a similar definition of that word, because of their "claim[] to be acknowledged by the world as a sovereign state," and because the Confederacy claimed to be a *de facto* a foreign power that had "made war on" the United States. *The Prize Cases*, 67 U.S. 635, 673-74 (1862). Section Three, enacted in a few years later response to the Civil War, referred to support for the Confederacy as "aid and comfort to … enemies," and treated "enemies" as foreign powers in a state of war with the United States.

On top of that, "aid and comfort to the enem[y]" involves only assisting a foreign government (or its citizens or subjects) in making war against the United States. Plaintiff does not, and cannot, allege that the January 6 attack involved any foreign power, or that the attackers constituted any sort of *de facto* foreign government.

## Conclusion

For the reasons stated above, Defendant Donald John Trump requests that the Complaint be dismissed with prejudice.

DATED this 6th day of October 2023.

Respectfully Submitted,
Rhoades & Erickson PLLC

By: */s/ Quentin M. Rhoades*
Quentin M. Rhoades
430 Ryman Street
Missoula, Montana 59802
(406) 721-9700 (phone)
(406) 721-5838 (fax)
qmr@montanalawyer.com

Respectfully Submitted,
Rhoades & Erickson PLLC

By: */s/ Robert Erickson*
Robert Erickson
430 Ryman Street
Missoula, Montana 59802
(406) 721-9700 (phone)
(406) 721-5838 (fax)
erickson@montanalawyer.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7, I certify that Defendant's Memorandum in Support is printed with proportionately spaced Equity text typeface of 14 point and double-spaced, except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word is 8,617 words, excluding this certificate of compliance.

_/s/ Quentin M. Rhoades_
Quentin M. Rhoades

## CERTIFICATE OF SERVICE

The undersigned counsel does hereby certify that on the **6th** day of **October 2023**, the foregoing ***Memorandum in Support of Motion to Dismiss*** was served upon all parties of record electronically via the Court's CM/EMF system as follows:

John Anthony Castro
12 Park Place
Mansfield, Texas 76063
J.Castro@CastroAndCo.com
*Pro Se Plaintiff*

State Attorney General
Austin Knudsen
215 N Sanders Street
Helena, MT 59601
Austin.Knudson@mt.gov
*Attorney for Defendant Secretary of State*

*/s/ Quentin M. Rhoades*
Quentin M. Rhoades